# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
      Plaintiff,

v.                                                Case No. 08-CR-327

**DERRELLE D. COLE**
      Defendant.

## DECISION AND ORDER

Defendant Derrelle Cole moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). For the reasons that follow, I deny his motion.

## I. FACTS AND BACKGROUND

Defendant served as the getaway driver while his two armed accomplices, Charles Cole and Jermaine Goodwin, robbed a bank in Greenfield, Wisconsin. (PSR ¶¶ 11-14.) After they entered the bank, Cole held the customers at gunpoint, threatening to shoot them if they moved. Goodwin hopped over the counter, pointed a gun at the head of a teller, and removed the money from her drawer, a total of $919. (PSR ¶ 11.) The two men fled the bank, got back into the car, and defendant drove away. Police located the vehicle shortly thereafter in a store parking lot, taking defendant and Cole into custody. (PSR ¶¶ 12-13.) Goodwin was arrested the following day. (PSR ¶ 14.)

Defendant pleaded guilty to armed bank robbery, 18 U.S.C. §§ 2113(a), (d), & 2, and brandishing a firearm during a crime of violence, 18 U.S.C. §§ 924(c)(1)(A)(ii) & 2, and on July 28, 2009, Judge Clevert sentenced him to a total of 196 months' imprisonment, consisting of 112 months on the robbery count and 84 months consecutive on the § 924(c) count, running

concurrently with a state sentence after revocation defendant was then serving. (R. 46.) In imposing a sentence below the career offender guideline range of 262-327 months, Judge Clevert granted the government's motion for a 25% downward departure. (R. 54 at 5.) However, he declined to further reduce the sentence, as requested by the defense, given defendant's extensive criminal history, which included convictions for conspiracy to commit armed robbery, burglary-party to a crime, armed robbery-party to a crime, and theft. (R. 54 at 12-13; PSR ¶¶ 40-43.) Judge Clevert further noted that defendant committed the instant offense shortly after being released from custody on a previous robbery (R. 54 at 13), explaining:

> This offense occurred on November 25th of 2008. You were released on September 16th, 2008. The clank of the prison door had not gone away at the time you committed this offense. This suggests to me that you have no fear of incarceration, no respect for the safety of other people, and that you were prepared to use a gun or participate in an offense where a gun is used without regard to the safety of others.

(R. 54 at 14:1-7.)

Defendant filed a notice of appeal, but his appointed counsel moved to withdraw, and the Seventh Circuit agreed that any challenge to the sentence would be frivolous:

> In advocating for 140 months, Cole pointed to his family ties, his history of mental illness and drug abuse, his cooperation with the government, and the length of his codefendants' sentences. The district court considered these factors but concluded that any mitigating value was outweighed by the nature of the offense and Cole's extensive criminal history, including another armed robbery for which he had been released from prison just two months before participating in the bank robbery. According to the court, Cole had demonstrated that he has "no fear of incarceration" or "respect for the safety of other people," and thus a sentence lower than 196 months would not adequately protect the public or reflect the seriousness of the offense. On appeal we would presume Cole's below-guidelines sentence to be reasonable, and, in light of the district court's careful consideration of the sentencing factors under 18 U.S.C. § 3553(a), Cole would be unable to rebut that presumption.

2

United States v. Cole, 380 Fed. Appx. 542, 543-44 (7th Cir. 2010) (internal citations omitted). Defendant is currently serving his sentence at USP Tucson, with a projected release date of November 25, 2023.[1] (R. 74-1.)

On August 17, 2020, defendant filed a pro se letter seeking compassionate release. I referred the matter to Federal Defender Services ("FDS"), pursuant to the court's standing order regarding First Step Act motions, and on October 14, 2020, FDS filed a supplemental motion for compassionate release. The government responded in opposition on November 13, 2020, and defendant replied on November 20, 2020. The matter is ready for decision.

## II. DISCUSSION

**A.  Compassionate Release Standards**

Pursuant to the First Step Act of 2018, the district court may grant what is commonly known as "compassionate release." The statute provides, in pertinent part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

---

[1] At the time of sentencing in this case, defendant was serving an 8-year state sentence after revocation. Defendant contends that it was his understanding that he would receive credit on his federal sentence from the point of arrest on November 25, 2008. However, the BOP has apparently declined to award credit from November 26, 2008, through July 28, 2009 (the date of the federal sentencing), as this time was credited towards the state revocation sentence. (R. 74 at 2; R. 68 at 1.) While resolving credit disputes is beyond the scope of the instant motion, I note that 18 U.S.C. § 3585(b) forbids double credit; the district court may adjust a federal sentence to account for time that will not be credited by the BOP. See U.S.S.G. § 5G1.3; United States v. Ross, 219 F.3d 592, 594 (7th Cir. 2000).

3

> (i) extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i).

The statute contains three requirements: (1) the defendant must first make a request to the warden before applying to the court; (2) the defendant must then demonstrate to the court that "extraordinary and compelling reasons" warrant a reduction in his sentence; and (3) the court must determine whether, even if such reasons are shown, a reduction of the sentence would be inconsistent with the applicable § 3553(a) factors and the need to protect the public. See United States v. Rodriguez, 424 F. Supp. 3d 674, 680 (N.D. Cal. 2019).

Other than noting that rehabilitation of the defendant alone will not suffice, Congress did not define the term "extraordinary and compelling reasons." Rather, Congress instructed the Sentencing Commission, in promulgating general policy statements regarding the sentence modification provisions in § 3582(c)(1)(A), to describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. See 28 U.S.C. § 994(t). The Commission's policy statement provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> (1)  (A) extraordinary and compelling reasons warrant the reduction . . .
>
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) the reduction is consistent with this policy statement.

4

U.S.S.G. § 1B1.13. The commentary to the policy statement indicates that extraordinary and compelling reasons exist under these circumstances:

> (A) Medical Condition of the Defendant.—
>
> > (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> > (ii) The defendant is—
> >
> > > (I) suffering from a serious physical or medical condition,
> > >
> > > (II) suffering from a serious functional or cognitive impairment, or
> > >
> > > (III) experiencing deteriorating physical or mental health because of the aging process,
> >
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
> > (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
> >
> > (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

The Commission has not updated the policy statement, which purports to require a motion from the director of the Bureau of Prisons, see U.S.S.G. § 1B1.13 cmt. n.4, since the passage of the First Step Act, which allowed defendants to bring their own motions. Accordingly, "because the Guidelines Manual lacks an applicable policy statement, the trailing paragraph of §3582(c)(1)(A) does not curtail a district judge's discretion." United States v. Gunn, 980 F.3d 980 F.3d 1178, 1180 (7th Cir. 2020); accord United States v. McCoy, 981 F.3d 271, 281 (4th Cir. 2020); see also United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020) ("[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.").

Giving the statutory terms their ordinary meaning, a defendant seeking compassionate release must demonstrate that his situation is extraordinary, i.e., beyond what is usual, customary, regular, or common, and his need for release compelling, i.e., irreparable harm or injustice will result if relief is not granted. United States v. Scott, 461 F. Supp. 3d 851, 862 (E.D. Wis. 2020); see also Gunn, 980 F.3d at 1180 (noting that the Commission's analysis can guide discretion without being conclusive). In the context of the COVID-19 pandemic, courts have found that modification may be warranted if the prisoner demonstrates that he is particularly vulnerable to the virus based on his age, health status, or other specific circumstances; courts have tended to deny compassionate release requests based on general concerns about possible exposure in prison. E.g., United States v. Dover, No. 14-CR-196, 2020 U.S. Dist. LEXIS 133340, at *16-17 (E.D. Wis. July 28, 2020); see also United States v. Thomas, No. 1:11-CR-22, 2020 U.S. Dist. LEXIS 172963, at *6-7 (N.D. Ind. Sept. 22, 2020)

6

(explaining that § 3582(c)(1)(A) contemplates a sentence reduction based on the particular circumstances of where the defendant is housed and his personal health conditions).

Finally, if the court decides that extraordinary and compelling reasons have been shown, it must also consider the applicable § 3553(a) factors to determine whether the sentence should be modified. Those factors include: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for the sentence imposed to provide just punishment, deterrence, protection of the public, and correctional treatment; (3) the kinds of sentences available; (4) the sentencing guideline range; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to the victims of the offense. 18 U.S.C. § 3553(a). In some cases, a court may find that the relevant § 3553(a) factors outweigh the extraordinary and compelling reasons warranting compassionate release and/or that release would undermine the goals of the original sentence. United States v. Bartlett, No. 06-CR-273, 2020 U.S. Dist. LEXIS 101393, at *13-14 (E.D. Wis. June 9, 2020). The court must also consider whether release would pose "a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

**B. Analysis**

**1. Exhaustion**

Defendant made an administrative request for compassionate release, which the warden denied on September 14, 2020. (R. 74 at 6-7; R. 81 at 2.) He has satisfied the statute's exhaustion requirement. (R. 81 at 7.)

7

Case 2:08-cr-00327-LA   Filed 01/07/21   Page 7 of 15   Document 87

## 2. Extraordinary and Compelling Reasons

Defendant seeks release based on health issues and family circumstances. (R. 74 at 1-2.) He indicates that he suffers from a variety of medical conditions, including obesity, type 2 diabetes, hypertension, glaucoma, and sleep apnea, which increase his risk of severe illness from COVID-19. (R. 74 at 5-6, 14-17.) The CDC lists some of these conditions as risk factors,[2] and courts have granted release to prisoners who suffer from them. See, e.g., United States v. Brown, No. 06-CR-327, 2020 U.S. Dist. LEXIS 237263, at *14 n.4, *18 (E.D. Wis. Dec. 17, 2020) (granting release to prisoner with hypertension, obesity, type 2 diabetes, and sleep apnea, and collecting cases); United States v. Ford, No. 13-CR-62, 2020 U.S. Dist. LEXIS 160935, at *7 n.4 (E.D. Wis. Sept. 3, 2020) ("Courts have found that when a prisoner has hypertension, diabetes, and/or obesity with other underlying illnesses, in conjunction with COVID-19, the prisoner has shown an 'extraordinary and compelling reason' for compassionate release."). Defendant further indicates that his parents are in poor health, requiring around the clock care, and his sister struggles to tend to them on her own. (R. 74 at 2, 23-24.) He states that if released he could stay with his parents and help provide the assistance they require, sharing responsibilities with his sister. (R. 74 at 20.)

---

[2]https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (indicating that persons who suffer from obesity and type 2 diabetes are at increased risk, and that persons with hypertension might be at increased risk) (last visited January 6, 2021). While the CDC has not recognized sleep apnea as a risk factor, there is some evidence suggesting that it is, see, e.g., United States v. Kwok-Ching Yu, No. 90 Cr. 47-6, 2020 U.S. Dist. LEXIS 220458, at *5 (S.D.N.Y. Nov. 23, 2020), and several courts have granted relief based on this condition in conjunction with other risk factors, such as obesity and/or hypertension, see United States v. Johnson, No. 03-20013-01, 2020 U.S. Dist. LEXIS 187755, at *5-6 (D. Kan. Oct. 9, 2020) (collecting cases).

8

In response, the government notes BOP's efforts to combat the pandemic. (R. 81 at 2-6.) As the government concedes, however, despite those efforts some inmates have and will become ill. According to the most recent data posted by the BOP, at USP Tucson 47 inmates are positive, 72 staff are positive, 8 inmates have died, 0 staff have died, 661 inmates have recovered, and 31 staff have recovered.[3]

The government concedes that defendant suffers from two conditions, obesity and type 2 diabetes, that put him at increased risk, and a third condition, hypertension, that might place him at increased risk. (R. 81 at 10.) However, the government contends that many of defendant's health problems appear to stem from his weight, something that may be within his ability to control. (R. 81 at 10-11.) The point is debatable, but even if defendant could over a period of time lose weight and thus improve his health, he appears to be at heightened risk now. See United States v. Shivers, No. 1:15-cr-00111, 2020 U.S. Dist. LEXIS 232797, at *11-12 (S.D. Ind. Dec. 11, 2020) ("[G]iven that Mr. Shivers' BMI is over 40 and weight loss is a difficult endeavor, it is unlikely that even a herculean effort to lose weight would reduce his risk of severe illness were he to contract COVID-19 during the remaining months of his incarceration."); United States v. Zarate, No. 2:14-cr-20065, 2020 U.S. Dist. LEXIS 234798, at *18 (C.D. Ill. Sept. 18, 2020) (noting that a variety of factors contribute to obesity, and that even if the prisoner could lose weight he cannot be expected to "recover" from obesity immediately).

The government notes that at the time of sentencing defendant weighed 235 pounds at a height of 5'7", producing a BMI of 36.8 (PSR ¶ 69), and prison records note that his weight

---

[3]https://www.bop.gov/coronavirus/ (last visited January 6, 2021).

has fluctuated from 252 to 269 pounds, for a BMI of 39.5 to 42.1.[4] While this may suggest that defendant can lose weight (R. 81 at 11), all of the BMI figures are well above the point of obesity. The government also notes that many people in the United States are obese, with a growing number suffering from diabetes, suggesting that defendant's situation is not unique. (R. 81 at 11-12.) However, defendant does not base his claim on common health conditions alone; he ties those conditions to the COVID-19 pandemic, which has hit prisons, including his facility, particularly hard.[5]

Finally, the government indicates that the BOP is treating defendant's diabetes and hypertension. The government acknowledges that the records document an "alarmingly high" blood pressure reading in November 2019, but defendant had apparently been non-compliant with medication at that time. (R. 81 at 12.) The CDC does not indicate that only persons with uncontrolled hypertension or diabetes are at higher risk, and defendant remains obese regardless of the care he receives. See United States v. Sparkman, No. 09-cr-0332-07, 2020 U.S. Dist. LEXIS 215776, at *19-20 (N.D. Ill. Nov. 18, 2020).

For all of these reasons, I find that defendant has demonstrated a basis for release

---

[4]See https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited January 6, 2021). Obesity = a BMI of 30 or greater.

[5]The CDC recently added being overweight—a BMI of 25 to 30—to the list of conditions that "might" create an increased risk of severe illness from COVID-19. As I noted in United States v. Meyer, No. 14-CR-230, 2020 U.S. Dist. LEXIS 199117, at *20 n.9 (E.D. Wis. Oct. 27, 2020), since nearly 3/4 of the American people are overweight, it may be difficult for a court to conclude that such a condition, without more, qualifies as unusual or extraordinary for purposes of compassionate release. In the present case, the record indicates that defendant is significantly obese and that he suffers from other health issues.

10

under § 3582(c)(1)(A).[6] I accordingly turn to the § 3553(a) factors to determine whether his sentence should be modified.

### 3. Section 3553(a) Factors

In discussing the § 3553(a) factors, defendant contends that there is little reason to keep him in prison any longer. He has served around 12 years, about 3/4 of the sentence imposed (with good time), sufficient to punish him for his role as the getaway driver in a robbery. (R. 74 at 24-25.) Defendant acknowledges his prior record but notes that he committed those crimes when he was much younger, and in none of them did he personally use a weapon. (R. 74 at 25.) In the instant case, it was again the co-actors who brandished guns, yet defendant notes that they both received lesser sentences than he, 85 and 117 months, respectively. (R. 74 at 26.)

Defendant notes that he is now 47 years old, an age when recidivism rates decline, and in deteriorating health. He further notes that, while in prison, he has earned his GED, completed drug education, participated in programming, and received no incident reports in the last six months. (R. 68-1; R. 74 at 5, 26; R. 74-2.) Finally, defendant contends that he has a solid release plan, living with his parents in their house, on home confinement if required. (R. 74 at 28-29.)

---

[6]The government does not in its response address defendant's family circumstances argument. Courts have generally found that a prisoner's desire to care for an elderly or infirm parent is not an extraordinary and compelling reason warranting a sentence reduction, particularly where another family member is available to assist. See, e.g., United States v. Nichols, No. 1:14-cr-00238, 2020 U.S. Dist. LEXIS 236064, at *9 (S.D. Ind. Dec. 14, 2020). Because defendant establishes grounds for release based on his health issues I need not decide whether his family circumstances would qualify.

11

The government argues that the motion should be denied under 18 U.S.C. § 3553(a) and U.S.S.G. § 1B1.13(2). The government stresses defendant's significant criminal history, which started when he was a teen and continued into middle age, and includes several revocations of community supervision. (R. 81 at 13-14.) The government notes that despite these interventions defendant has not been deterred from committing serious new crimes in which victims were threatened with violence. (R. 81 at 14-15.) "[Defendant] has been incarcerated numerous times and presented with myriad opportunities to demonstrate that he would no longer be a threat to society, and each and every time he has failed. There is no reason to believe his conduct has been altered." (R. 81 at 15.) Indeed, the government notes, defendant has continued to engage in criminal conduct while incarcerated. According to Inmate Disciplinary Data, on January 21, 2019, defendant "scammed" $400 from another inmate's father over the phone and admitted to the conduct. (R. 81 at 15; R. 81-1 at 1.) The disciplinary record also lists violations for possession of an intoxicant, fighting, refusing to obey an order, possessing a non-hazardous tool, and use of drugs/alcohol. (R. 81-1 at 1-2.) Finally, the government notes that, contrary to defendant's contentions regarding his release plan, he has never complied with supervision in his past cases, and if released to Milwaukee he will be returning to an area experiencing a COVID-19 spike, thus potentially exposing his elderly parents to greater risk. (R. 81 at 15-16.)

In reply, defendant notes that he is much older now than when he went to prison. He further notes that the government does not address the option of placing him on home confinement, which would allow the court to protect his health while also protecting the public and saving BOP resources. (R. 82 at 6.) Defendant also contends that the extra benefit of requiring him to serve another two or three years in prison is likely to be small. He cites

Sentencing Commission research indicating that prisoners released early under the "drugs minus 2" guideline amendment did not re-offend at higher rates than those who served out their sentences. (R. 82 at 7.) He argues that the 12 years he has served suffices to punish, that he has incurred limited prison discipline, and that he has taken advantage of programming. (R. 82 at 7-8.) Finally, defendant disputes the government's contention that he would be safer in prison, noting that according to public health experts prisons are "tinderboxes" for infectious disease, with USP Tucson particularly hard hit. (R. 82 at 8-11.)

I agree with the government that reducing defendant's sentence would be inconsistent with the need to promote respect for the law, to deter defendant from further criminal activity, and to protect the public. Defendant's adult criminal record began in December 1992, when he acted as the lookout while an armed accomplice attempted to rob a store. Convicted of conspiracy to commit armed robbery, he was sentenced to 5 years in prison. According to court records, he did not have a good adjustment to incarceration. He had two escapes from the halfway house, absconded for approximately one month, and was arrested in Michigan before being returned to Wisconsin. According to probation records, he did not have a good adjustment to supervision either. He did not report as instructed and engaged in new criminal conduct approximately two months after his release. (PSR ¶ 40.)

Defendant committed his next offense, a burglary, in March 1993. Witnesses reported that he used a crowbar to break into the victim's residence, stealing a clock radio, telephone, and lamp. The court imposed 5 years in prison, stayed for 5 years probation, but due to an administrative error the probation was never enforced. (PSR ¶ 41.)

In December 1996, defendant participated in another armed robbery. The victim reported that defendant offered to help her move, making several inquiries about how much

13

money she had; in response, she reported having $140 to purchase Christmas toys for her children and $300 for her rent. Defendant then left, purportedly to find a man with a truck to assist in the move. A short time later, another man came into her residence holding a handgun and demanding money. The gunman was later arrested and stated defendant planned the whole thing, providing the handgun and telling him what to say. Defendant's accomplice in this incident was the same person he was with in the 1992 case. The court sentenced defendant to 216 months in prison, but he was paroled in 2005. He again adjusted poorly to supervision, failing to pay restitution or report as instructed. He was revoked in 2007 based on new criminal conduct and again in 2009 based on the instant offense. (PSR ¶ 42.)

In January 1997, defendant committed a theft, stealing purses from a vehicle and attempting to use the victims' credit cards. He was at the time in absconder status with the Department of Corrections. The court imposed a sentence of 1 year in prison. (PSR ¶ 43.)

As indicated above, defendant was released from state prison on September 16, 2008, and he committed the instant offense on November 25, 2008. In a statement protected by U.S.S.G. § 1B1.8, defendant also admitted being involved in another robbery on November 20, 2008. (PSR ¶ 37.)

Defendant notes that he committed his prior offenses between the ages of 19 and 23, but he was 35 when he committed the instant offense, no longer a young man. And his violations have not stopped since that time. While defendant's prison disciplinary record (which he does not contest) does not appear to be extensive, less than two years ago he was involved in scamming another inmate's father over the phone. This suggests a lack of respect for the law. It further suggests that, while recidivism rates generally decline with age, that may not be the case here.

14

Defendant contends that he is now older and in poor health, but the PSR indicated that he was obese and suffered from other health issues, including hypertension, sleep problems, and back pain, at the time he committed the instant offense. (PSR ¶¶ 69-70.) Defendant notes that in his prior cases his accomplices carried the guns and did the leg work, but it is hard to see this as supporting his motion at this point. Defendant has a record of coordinating with or prompting others to commit robberies while he remains in the background; even in diminished physical condition, he remains a risk to continue this pattern.

Defendant notes the shorter sentences received by the co-actors in this case, but as his lawyer conceded at the original sentencing hearing, their records were less significant than defendant's. (R. 54 at 8.) Judge Clevert considered this argument, and I see no basis for modifying the sentence now to avoid disparity.

Finally, while defendant's release plan includes options for a residence, it is silent as to employment or other means of support. Defendant's prior work record is extremely limited. (PSR ¶¶ 81-83.)

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion as supplemented (R. 68, 74) is denied.

Dated at Milwaukee, Wisconsin, this 7th day of January, 2021.

/s Lynn Adelman
LYNN ADELMAN
District Judge

15

Case 2:08-cr-00327-LA   Filed 01/07/21   Page 15 of 15   Document 87